2009 WL 6551494

2009 WL 6551494
Only the Westlaw citation is currently available.
United States District Court,
E.D. New York.

Dorothy BARNEY, Plaintiff,
v.
CONSOLIDATED EDISON COMPANY
OF NEW YORK, Defendant.

Civil Action No. CV–99–823 (DGT)(SMG).
|
Oct. 1, 2009.

**Synopsis**
**Background:** Discharged African-American employee of private utility company brought employment discrimination action against her former employer, alleging that she was retaliated against for complaining about sex and race discrimination in violation of Title VII, § 1981, New York State Human Rights Law, and New York City Administrative Code. Employer moved for summary judgment.

**Holdings:** The District Court, Trager, J., held that:

[1] employee's termination qualified as adverse action;

[2] employee was not similarly situated to section manager or vice president;

[3] there was causal connection between employee's complaining of discrimination and supervisor's request for investigation three months later;

[4] audit report was admissible;

[5] legitimate, non-retaliatory reasons proffered by employer for terminating employee were not pretext for retaliation;

[6] co-worker's deposition testimony was insufficient to raise material issue of fact; and

[7] it would decline to exercise supplemental jurisdiction over claims arising under state and municipal law.

Motion for summary judgment granted.

**Attorneys and Law Firms**

Dorothy Barney, New York, NY, pro se.

Barbara Jane Carey, Consolidated Edison Company, New York, NY, for Defendant.

*MEMORANDUM AND ORDER*

TRAGER, District Judge.

*1 Plaintiff Dorothy Barney ("plaintiff" or "Barney") brings this employment discrimination case against her former employer, Consolidated Edison Company of New York, Inc. ("defendant" or "Con Ed"). Plaintiff alleges that she was retaliated against for complaining about sex and race discrimination in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et. seq.* ("Title VII"); 42 U.S.C. § 1981 ("Section 1981"), New York State Human Rights Law § 296 and the New York City Administrative Code §§ 8–107, 8–502. [1] Defendant moved for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. For the reasons explained below, defendant's motion for summary is granted with regard to plaintiff's federal retaliation claims. Plaintiff's state law and municipal law retaliation claims are dismissed without prejudice.

**Background**

Con Ed is a privately owned utility company that provides electric, gas and steam service in New York City and Westchester County. Dec. of Barbara Jane Carey in Supp. of Def.'s Mot. for Summ. J. ("Carey Dec.") ¶ 2.

Dorothy Barney, an African–American female, worked at Con Ed as a Management Secretary from 1972 until her termination in September 1998. Affirmation of Dorothy Barney ("Barney Aff.") ¶ 2; Ex. A at 2 (EEOC Charge). [2] From May 1996 until her termination, Barney served as Michael Saladino's secretary in the Queens Environmental, Health and Safety Operations department. Deposition of Michael Saladino ("Saladino Dep.") 9; Barney Aff. ¶ 4; Ex. A at 2, Ex. H (1996 and 1998 reviews). Saladino, the Section Manager for the department, reported to Robert Donohue, Vice President of Brooklyn/Queens Electric. Ex. A at 2, 4. Barney was terminated after an internal audit investigation

determined that she: (1) intentionally entered overtime hours that she did not work into Con Ed's timekeeping system; (2) made misleading statements in order to keep the overtime payments; (3) tried to conceal her actions by altering timekeeping records after her supervisor questioned her about the overtime; (4) deleted timekeeping records related to jury duty service that she performed in January 1997; and (5) failed to properly report sick time when she stayed home sick during jury duty service. Ex. R. (Sep. 9, 2008 Memorandum from Joseph P. Liotta).

**(1)**

**Complaint to Al Heyden**

Sometime in the fall of 1997, after Saladino was promoted from manager to section manager, she told Barney that she may no longer be able to work for him because company policy prevented Management Secretaries in Barney's classification from working for Section Managers. Deposition of Dorothy Barney ("Barney Dep.") 16, 96; Ex. A at 8–9 (Oct. 15, 1997 letter from Barney to Al Heyden). Barney contacted Al Heyden in Human Resources to determine if any such policy existed. Barney Dep. 17, Ex. A at 8–9. In a follow-up letter to Heyden dated October 15, 1997, Barney noted that she was the only African–American female management secretary. Ex. A at 8–9. The letter also stated: "I hope ... that this situation is not another one of the frequently racially discriminating acts that has been done to me during my tenure with the Company." *Id.* at 9. In the letter, Barney also claimed that she had been "precluded ... from obtaining promotions" and was paid a lower salary than other management employees. Ex. A at 9. Around this time, Barney spoke with Claude Trahan, the director of Con Ed's internal EEO office, telling him that she feared that she would receive a poor performance review. Barney Dep. 116; Ex. N (Mar. 25, 1998 letter from Barney to Trahan).

**\*2** Heyden ultimately informed Barney that there was no policy preventing her from working for a Section Manager and, therefore, that she could keep her job. Barney Dep. 17. Barney continued serving as Saladino's secretary until her termination. *Id.* 16.

**(2)**

**"Racial" Comments By Vivian Bogus**

From November 1997 through January 1998, Barney temporarily covered for a secretary in Donohue's office. Ex. A at 4 (Attachment # 1 to EEOC Charge); Ex. O (Apr. 12, 1998 Letter from Barney to Richard Toussaint). At the time, Vivian Bogus, Donohue's white secretary, was also working in Donohue's office. Barney Dep. 20.

On December 16, 1998, an article appeared in the Daily News about a race discrimination class action that had been brought against Con Ed.[3] *Id.* In front of Barney, Bogus defended Con Ed in a conversation with another white employee. *Id.* at 20, 101. When Barney heard this, she told Bogus that those employees "really felt like they were discriminated against" and tried to explain to Bogus that the employees had college degrees and should have been promoted. *Id.* Bogus responded that "maybe those people were not competent." *Id.* at 20, 103. After Barney stated that "this is why they have Affirmative Action," Bogus responded that "Affirmative Action is bullshit." *Id.* at 21, 102. Barney replied that Bogus was entitled to her opinion. *Id.* at 103. Bogus continued to discuss the issue for a week, telling Barney that Con Ed does not discriminate and that Affirmative Action is "ridiculous." *Id.* at 21. Barney, who found Bogus' remarks "offensive," told Bogus that she did not want to discuss the issue. *Id.* at 21.

At some point during her temporary tenure in Donohue's office, Barney requested a vacation day from Saladino in order to get away from the difficult working atmosphere. Ex. O. When Saladino asked her why she needed the day off, she told him that Bogus had made "racial remarks to her," without explaining the substance of what Bogus had said. Saladino Dep. 94; Ex. O. Saladino responded that "he does not tolerate racism of any kind" and asked Barney if there was anything she would like him to do, such as contacting Con Ed's internal EEO office. *Id.* Barney told Saladino that she did not want to report the comment because she did not want to cause problems and she believed that Bogus was entitled to her opinion. Ex. O.

**(3)**

**1998 Performance Review**

Barney v. Consolidated Edison Co. of New York, Not Reported in F.Supp.2d (2009)
2009 WL 6551494

On approximately March 13, 1998, Saladino gave Barney her annual performance review.[4] Ex. H (1998 review). The review stated that Barney's "overall performance is not satisfactory" and that she did not meet the requirements of her position. *Id.* The review criticized Barney in almost every "Management Performance Factor" covered by the review, including: Communication Skills, Decision Making, Flexibility, Initiative, Job Knowledge and Leadership. *Id.* The "Job Knowledge" section of the review stated that Barney was unable to "perform routine job responsibilities without extensive input from others or requires frequent supervisory corrections to perform her job responsibilities." *Id.* This section also noted a number of specific issues with Barney's work including frequently incorrect phone messages and errors on Con Ed's MPARE and TDES computer systems. *Id.* The "Communication Skills" section stated that Barney "often communicates in a confusing way" and, when asked questions, becomes defensive and will bring up unrelated topics such as the "[i]ncident back in September 1997 when she told everyone that she had been fired." *Id.* The "Flexibility" section of the review noted that "[w]hen asked to fill in for the Secretary in the VP or GM's office, [Barney] does so reluctantly and expresses her disapproval in having to do so." *Id.*

**\*3** Barney's 1996 review, which was the only other review that she received from Saladino, appears to have been satisfactory, but also included a number of criticisms. Ex. H (1996 review). The 1996 review noted that: (1) Barney's oral communication skills are "sometimes confusing"; (2) Barney requires "frequent supervisory corrections to perform some of her job functions"; and (3) Barney's "performance, particularly in the area of paying attention to details, needs to be improved." *Id.* Prior to Saladino becoming her supervisor, Barney had received satisfactory reviews, which included some negative comments, but were much less critical than Saladino's reviews.[5]

### (4)

### Complaints

Following her unsatisfactory review in March 1998, Barney filed a number of internal complaints.

On March 20, 1998, Barney sent a letter to Richard Cowie, Vice–President of Human Resources, which she copied to Donohue and Saladino. Deposition of Robert Donohue ("Donohue Dep.") 31, 42; Ex. M (Mar. 20, 1998 letter from Barney to Cowie). In the letter, Barney disputed her performance review and complained about the training she had received. Ex. M. With regard to the performance review, Barney asserted that she had never been informed of problems with many of the Management Performance Factors discussed in the review. *Id.* In the letter, however, Barney did concede that, during the review period, she twice sent e-mails to staff indicating the wrong days for meetings and that she was given a note by Saladino in February 1997 addressing her inattention to detail in basic responsibilities. *Id.* Barney also admitted in the letter that, on the two occasions that Saladino checked her MPARE entries, he discovered two errors. *Id.* In addition, Barney conceded additional errors at her deposition.[6]

In the March 20, 1998 letter to Cowie, Barney also complained about the training that she had received. Ex. M. Although some portions of the letter suggest that Barney was simply complaining that managers were eligible to receive training that was not available to secretaries, other statements in the letter, which assert that all the employees who received training were male managers, suggest that Barney may have been complaining of sex discrimination. *Id.*

On March 25, 1998, Barney sent a letter to Trahan, complaining about her performance review. Barney Dep. 116; Ex. N. Barney noted that she was the only African–American Management Secretary in her department and that she believed that she was being "eased" of out of her position. Ex. N.

On April 12, 1998, Barney sent a letter to Richard Toussaint, a representative in Con Ed's EEO office, complaining that Saladino had retaliated against after her after she informed him of Bogus' "racial remarks" and that she had been discriminated against on account of her race regarding wages and promotions. Barney Dep. 116, Ex. O. The EEO office investigated Barney's allegations. Barney Dep. 329–30.

**\*4** At some point after Barney disputed her performance review, she met with Saladino and a Human Resources representative about the review. When the discussion turned to the comment in the "Flexibility" section of the review that noted Barney's reluctance to work in the Vice President's Office, Saladino stated that the Barney "was going on and on about [the comments made by Bogus]." Ex. O.

2009 WL 6551494

Starting in June 1998, Toussaint attempted to help Barney improve her work performance and her relationship with Saladino. Barney Aff. ¶ 11. Toussaint spoke with both Barney and Saladino and instructed Saladino to prepare a list of tasks and goals for Barney. *Id.* Saladino, however, refused to provide Barney feedback on her performance or to meet with her in order to discuss the creation of the tasks and goals list. *Id.* ¶ 12.


(5)


**Overtime And The MPARE System**

**a. Overview**
As part of her duties, Barney was responsible for entering, into Con Ed's MPARE computer database, the time worked by the employees in her department. Barney Dep. 122–25. Although every employee could access the MPARE system in order to input or adjust his or her own time, Barney's security code allowed her to enter other employees' information. Deposition of Kenneth Mason ("Mason Dep.") 14, 17; Saladino Dep. 18.

Barney began working on the MPARE system in 1994. Barney Dep. 122–23. For two years, Barney only inputted straight time. *Id.* at 123. Starting in 1996, Barney was tasked with inputting both straight time and compensatory time (i.e., overtime). *Id.* at 123, 130. The employees working under Saladino's supervision would give Barney their attendance sheets, which would show the straight time and overtime that they had worked. Barney Dep. 125–27; Saladino Dep. 18; Mason Dep. 14–15.

In order for the time that Barney input into the MPARE system to be processed, it had to first be reviewed and approved by Saladino. Mason Dep. 19. At the end of each month, after Barney would inform Saladino that she had entered all of the overtime information into the MPARE System, Saladino would "go in under [his] security code and approve [the overtime]." Saladino Dep. 18; Barney Aff. ¶ 14; Mason Dep. 9. In approving overtime, Saladino would not review the overtime hours worked by each individual employee. Saladino Dep. 19. Although Saladino could have reviewed individual employees' hours, he instead used a "group approval code" that enabled him to approve the overtime for the entire group of employees that he supervised without looking at individual names. *Id.* at 66–69. When using the group approval code, the total number of hours for the group would be shown, but not specific dates or individual names. *Id.* at 67–68. Saladino would approve the overtime data inputted by Barney without any inspection or review because Saladino trusted that her data entry was correct. *Id.* at 19–21.

In addition, the overtime also had to be approved by Donohue, Saladino's supervisor. Mason Dep. 19; Barney Aff. ¶ 14. There is, however, no evidence explaining how Donohue's approval was obtained.


**b. March Overtime Payment**
 **\*5** On or around April 24, 1998, Barney received a direct deposit pay stub showing that she had received, in addition to her regular salary, an extra $73 deposit into her account. Def.'s 56.1 Statement ¶ 51; Pl.'s Comp. ¶ 23, Pl.'s Opp'n Brief at 4; Ex. A at 4, 6 (Attachment # 1 to EEOC Charge); Mason Dep. 23. Because Barney was paid through direct deposit, she would have received a pay statement rather than a check that needed to be deposited. Barney Aff. ¶ 13; Ex. A at 6 (Attachment # 1 to EEOC Charge); Ex. R (Statement of Earning and Deductions for Barney dated June 30, 1998).[7] Barney claims that when she received this payment, she was not sure what it was for.[8] It was later determined that the $73 payment was for five hours of overtime from early March 1998. Ex. R (Printouts from Management Pay and Reimbursement System for Mar. 4–5, 1998).

Ken Mason was a Senior Specialist who also reported to Saladino. Mason Dep. 18. According to Mason, sometime in April 1998, Barney told him that she had received a check and that she was not sure what it was for. *Id.* at 23. Mason told Barney that she should contact the Payroll department ("Payroll"). *Id.* at 24. About two weeks later, Mason followed up with Barney and asked her what had happened with the check. *Id.* Barney told Mason that she had sent the check back. *Id.* at 28.

Barney does not dispute that the above conversations with Mason occurred. However, in her EEOC Charge, Barney did allege that, sometime in May, she contacted Payroll to ask why she received this check. Ex. A at 6. According to Barney, after a Payroll representative was unable to give her an answer, Barney informed the representative that she had made a "payroll change" in March. *Id.* The representative responded that the check may have been a result of that change. *Id.*

Barney v. Consolidated Edison Co. of New York, Not Reported in F.Supp.2d (2009)
2009 WL 6551494

**c. May Overtime Payment**

Sometime in late June 1998, overtime checks were given to Mason for distribution. Mason Dep. 29. At the time, both Barney and Saladino were on vacation. Mason Dep. 29; Barney Dep. 275; Ex. A at 4–5 (Attachment # 1 to EEOC Charge). Mason noticed that included with these checks was an overtime check for Barney.[9] Mason Dep. 29. Because Mason was under the impression that Barney normally did work not overtime, Mason brought the check to Saladino's attention when Saladino returned from vacation. Barney Dep. 29, 33; Saladino Dep. 34. Saladino thought that this was unusual because Barney did not work overtime. Saladino Dep. 34. The payment Barney received was for 19 hours of overtime in May, Ex. R (Printouts from Management Pay and Reimbursement System for May 2, 1998 and May 10, 1998); Ex. R (Statement of Earning and Deductions for Barney dated June 30, 1998). Through either this conversation with Mason or a later discussion with Barney, which is outlined below, Saladino also learned, for the first time, about the earlier $73 overtime payment that Barney had received. Saladino Dep. 34.

*6 On July 7, 1998, after Barney returned from vacation, she was asked by Saladino and/or Mason if she had worked overtime. Barney Dep. 275; Ex. R (Sep. 9, 2008 Memorandum from Joseph P. Liotta). Barney responded that she had not. Saladino Dep. at 72; Barney Dep. 275. When asked why her name was on the overtime list and why she had been paid for overtime, Barney Dep. 275, Barney stated that she may have accidently entered the hours of an employee named Edgar Cortes into her own "spot," *id.* at 288. Barney was told that she had to return the money she had received and that the Auditing Department ("Auditing") would have to investigate the matter. *Id.* at 275. Later that day, Barney gave Saladino a check for $277. Barney Dep. 275; Saladino Dep. 42; Donohue Dep. 30, Ex. A at 4, 6 (Attachment # 1 to EEOC Charge); Ex. A at 20 ($277.55 check from Barney).

When Barney was asked about the $73 payment, Barney claimed that she had changed her tax dependents and that she had spoken to someone in Payroll about the issue. Saladino Dep. 38. According to Barney, someone in Payroll, whom she could not identify by name, told her that the $73 was a reimbursement for those taxes. *Id.* When Saladino inquired with Payroll, he was told that employees do not get any money back when they change the number of their dependents. *Id.* The $73 was eventually deducted from Barney's paycheck in August 1998 after Barney, as discussed more fully *infra,*

deleted the March overtime data from the MPARE system. Ex. A at 4–6; Ex. R.

On July 13, 1998, Saladino contacted Auditing to investigate the payments in order to determine if Barney had made a mistake or whether she had manipulated the system. Saladino Dep. 39; Ex. R (Ethics Helpline Contact Form). Saladino asked Auditing to become involved because he wanted a fair and objective review. Saladino Dep. 39. Also, Saladino informed Auditing that he wanted an independent investigation because Barney had previously-filed an EEO grievance against him after he gave her a poor performance review. Ex. R (Sep. 9, 2008 Memorandum from Joseph P. Liotta).

Prior to the incident in July 1998, Barney had asked, on several occasions, for training on the MPARE system. Barney Aff. ¶ 17. She also asked for such training after the incident because, if she had made a mistake, she wanted to ensure that she did not repeat that mistake. Barney Dep. 139; Ex. A at 6 (Attachment # 1 to EEOC Charge). Saladino told her that because she had worked on the system for four years she did not need training. Ex. A at 6 (Attachment # 1 to EEOC Charge).

(6)

**The Audit Report**

On September 9, 1998, Auditing issued a report summarizing its investigation. Ex. R. Attached to the report were numerous supporting documents. *Id.* The report included a number of findings and conclusions, which are detailed below. *Id.*

The report found that Barney intentionally entered overtime data in March 1998 and May 1998 for overtime that she had not worked and that, although Saladino had approved this overtime, Saladino did not individually check each entry.[10] *Id.* Auditing also concluded that "the incorrect entries and subsequent actions taken by Barney, were intentional and not errors on her part." *Id.*

*7 Barney told Auditing that she made the entries in error because she was not taught how to use the MPARE system and was not proficient in it. *Id.* Auditing, however, concluded that Barney had sufficient knowledge of, and experience with, MPARE to use the system. *Id.* Although one employee,

Michelina Trela, confirmed Barney's claim that Barney had initially asked Trela questions about the MPARE, Barney had not asked her questions about MPARE for some time. *Id.* Moreover, although Saladino confirmed his statement in Barney's review that she had made MPARE errors in the past, Saladino told Auditing that none of those prior errors involved entry of overtime hours. *Id.*

Barney also told Auditing that she may have mistakenly entered the overtime worked by another employee, Edgar Cortes, as her own. *Id.* Auditing, however, concluded that Barney's explanation was implausible because the overtime records that Barney entered for herself did not match the records for Cortes or any other employees in the department. *Id.*

Auditing also concluded that, in April 1998, Barney made misleading statements to Mason about the $73 payment that she received in an effort to keep the payment. *Id.* When Mason first discussed the payment with Barney, she told him that she had returned the check to payroll. *Id.* Auditing, however, concluded that, at the time, Barney never had a check to return because the funds had been deposited directly into her bank account. *Id.* Moreover, when Barney was confronted in July, she told a different story, explaining that someone in Payroll had told her that she was entitled to receive the March payment because of a payroll deduction change. *Id.*

The report also concluded that Barney tried to conceal her actions by deleting the March overtime data. *Id.* On July 8, 1998, under Mason's direction and supervision, Barney adjusted the May MPARE data related to the $277 payment she had received. *Id.* When Barney made that adjustment, Mason observed that Barney's March MPARE overtime record did not need to be adjusted. *Id.* At the time, Mason believed that Barney had previously corrected the March overtime record in April. *Id.* The MPARE records, however, revealed that Barney had adjusted the March data sometime in July 1998. *Id.* Auditing opined that this was done after the overtime payments were brought to her attention on July 7, 1998. *Id.* Barney denied that she deleted the data. *Id.*

In addition to looking into Barney's overtime, Auditing also investigated whether Barney had changed any other MPARE entries. *Id.* Auditing found that in December 1997 Barney deleted 19 days of grand jury service that had originally been recorded in the MPARE system in January 1997. *Id.* Although this change had to be approved by management, Auditing concluded that, based on the nature of the MPARE system,

it was unlikely that a manager approving the change would have been aware that he or she was approving an adjustment to a prior month's record. *Id.* Barney denied making these adjustments and told Auditing that such adjustments would not have benefitted her in any way. *Id.* According to the report, Con Ed's policy is to pay employees their regular pay during jury service, but not more than once in a two year period. [11] *Id.* Although Auditing could not determine why Barney would have deleted her 1997 jury duty service from the MPARE system, Auditing speculated that Barney may have done this so that she would be eligible, under Con Ed's policy, to serve on a jury again within the two-year period. *Id.*

*8 Finally, Auditing also determined that, in January 1997, while Barney was serving on a grand jury for a month, she was out sick for four days that she reported to Con Ed as jury duty time. *Id.; see also* Barney Dep. 234–35. Barney never reported those days as sick days to Con Ed. Ex. R; *see also* Barney Dep. 235, 237–39. Barney told Auditing that she did not report that she was sick because it made no difference to Con Ed as she was not at work in either case. [12]

### (7)

### Termination

Because Saladino was on vacation when Auditing's report was issued, Ex. A. at 5 (Attachment # 1 to EEOC Charge), the report was given to Donohue, Donohue Dep. 42. After reviewing the report, Donohue decided to terminate Barney because the report indicated that she "stole from the company" and was not cooperative during the investigation. Donohue Dep. 6, 41–42. Donohue claims that the report was the sole reason for her termination. *Id.* at 6.

In order to terminate Barney, Donohue needed concurrence from Cowie, Vice–President of Human Resources. *Id.* at 31, 42. At this deposition, Cowie testified that:

> [Donohue told me that] he had an audit report which indicated that Miss Barney had falsified records and indicated that she was on jury duty for two days when she actually was not and that based on those two things and her overall performance, he thought there was reasonable grounds

for termination and request[ed] our concurrence.

Cowie Dep. at 6–7. After speaking with Donohue, Cowie asked Marilyn Benetatos, a subordinate in his department to look into Barney's case and to give Cowie a recommendation. Cowie Dep. 6–7.

On September 10, 1998, Barney was interviewed by Heyden and Thomas McCarron, who was the acting Section Manager in Saladino's absence. Barney Dep. 262; Ex. A at 5 (Attachment # 1 to EEOC Charge). At the meeting ("termination meeting"), McCarron informed Barney that she was being terminated for gross misconduct and serious violations of Con Ed's Code of Conduct, including: (1) falsification of company records; (2) receipt of payments that she was not entitled to; (3) failure to cooperate fully with the investigation by making misleading statements; and (4) failure to follow company procedure regarding reporting of sick days. [13] Barney Dep. 263; Ex. U (Exit Interview Summary); *see also* Ex. S (Notice of Termination of Employment) (noting, in "Remarks" section, "Receiving Payment for which Employee was not Entitled" and "Reporting of Jury Duty & Sick Time"). After Barney filed an internal appeal of her termination, Ex. V (Sep. 15, 1998 letter from Barney to Donohue), Jack Peterson, whom Donohue had assigned to investigate the appeal, concluded that her termination was proper. [14] Donohue Dep. 53.

According to Donohue, Con Ed's policy is to terminate employees found to have stolen from the company, "generally, regardless of the amount." *Id.* at 16; *see also* Cowie Dep. 9 (stating that employees have been terminated for thefts of small amounts, including incidents where employees stole paper towels, tools and plumbing supplies). In addition, employees who falsified records have been terminated even where no theft was involved. Cowie Dep. 9. Although Donohue admitted at his deposition that if Barney had accidently put money in her account and then returned it or reported it she probably would not have been fired, Donohue felt that he had to follow the audit report's findings. Donohue Dep. 23–24.

**\*9** When Saladino returned from vacation, he was informed that Barney had been terminated. Saladino Dep. 14. Saladino did not recommend that Barney be fired and appears to have played no role in the termination decision. *Id.* 31.

Although not discussed in the report, Auditing's investigation of Barney revealed that Saladino had given Barney his security code so that she would be able to log onto his computer. Saladino Dep. 17, 42; Barney Dep. 17. Donohue informed Saladino that this was improper. Saladino Dep. 17. Donohue also criticized Saladino's method for approving overtime. *Id.* 11, 16, 70. Saladino's actions, however, did not result in a negative performance review or salary decrease. *Id.* 71. After the incident with Barney's overtime, Saladino adopted a new method for approving overtime where he would review each individual's daily overtime records before approving their overtime. *Id.* 19–20.

### Discussion

### (1)

### Title VII Retaliation

**[1]** "Title VII makes it unlawful for an employer to discriminate against an employee 'because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.' " *Terry v. Ashcroft,* 336 F.3d 128, 140 (2d Cir.2003) (quoting 42 U.S.C. § 2000e–3(a)). "Title VII is violated when 'a retaliatory motive plays a part in adverse employment actions toward an employee, whether or not it was the sole cause.' " *Id.* at 141–42 (quoting *Cosgrove v. Sears, Roebuck & Co.,* 9 F.3d 1033, 1039 (2d Cir.1993)); *see also Jute v. Hamilton Sundstrand Corp.,* 420 F.3d 166, 173 (2d Cir.2005) ("employee must show that retaliation was a substantial reason for the adverse employment action") (citation omitted); *Raniola v. Bratton,* 243 F.3d 610, 625 (2d Cir.2001) ("A retaliatory motive must be ... a substantial or motivating factor behind the adverse action." (citations and internal quotation marks omitted)). [15]

**[2]** To establish a *prima facie* case of retaliation, plaintiff must show " '(1) participation in a protected activity; (2) that the defendant knew of the protected activity; (3) an adverse employment action; and (4) a causal connection between the protected activity and the adverse employment action.' " *Jute v. Hamilton Sundstrand Corp.,* 420 F.3d 166 (2d Cir.2005) (quoting *McMenemy v. City of Rochester,* 241 F.3d 279, 282–83 (2d Cir.2001)). Plaintiff's burden at this stage "has been characterized as 'minimal' and 'de minimis.' " *Id.* (quoting *Woodman v. WWOR–TV,* 411 F.3d 69, 76 (2d Cir.2005)).

[3]   Once the plaintiff meets this burden, a presumption of retaliation arises and the burden shifts to the defendant to articulate a legitimate, non-retaliatory reason for the adverse employment action. *Id.* After the defendant offers such proof, "the presumption of retaliation dissipates" and the plaintiff bears the ultimate burden of persuading the trier of fact that "retaliation was a substantial reason for the adverse employment action." *Id.*

**\*10** [4]   A plaintiff "may attempt to establish that he was the victim of intentional discrimination 'by showing that the employer's proffered explanation is unworthy of credence.' " *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 143, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000) (quoting *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 256, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981)); *see also Taylor v. Family Residences and Essential Enters., Inc.*, No. 03–CV–6122, 2008 WL 268801, at \*8 (E.D.N.Y. Jan. 30, 2008) (A plaintiff "may show pretext by demonstrating such weaknesses, implausibilities, inconsistencies, incoherences, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted nondiscriminatory reasons." (citations and internal quotation marks omitted)).

[5]   [6]   [7]   [8]   "In appropriate circumstances, the trier of fact can reasonably infer from the falsity of the explanation that the employer is dissembling to cover up a discriminatory purpose." *Reeves*, 530 U.S. at 147, 120 S.Ct. 2097. Where a plaintiff offers evidence of pretext, courts must take a "case-by-case approach" and examine "the entire record to determine whether the plaintiff could satisfy his 'ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff.' " *Schnabel v. Abramson*, 232 F.3d 83, 90 (2d Cir.2000) (quoting *Reeves*, 530 U.S. at 143, 120 S.Ct. 2097). Whether summary judgment is appropriate depends on "a number of factors," including "the strength of the plaintiff's prima facie case, the probative value of the proof that the employer's explanation is false, and any other evidence that supports the employer's case and that properly may be considered on a motion for judgment as a matter of law." *Reeves*, 530 U.S. at 148–49, 120 S.Ct. 2097. As the Court in *Reeves* noted, where "the plaintiff has established a prima facie case and set forth sufficient evidence to reject the defendant's explanation," judgment as a matter of law may still be appropriate, where, for instance, "the

record conclusively revealed some other, nondiscriminatory reason for the employer's decision, or if the plaintiff created only a weak issue of fact as to whether the employer's reason was untrue and there was abundant and uncontroverted independent evidence that no discrimination had occurred." *Id.* at 148, 120 S.Ct. 2097.

### (2)

### *Prima Facie* Case

#### a. Materially Adverse Action

[9]   [10]   [11]   To establish a prima facie case, Barney must show that Con Ed subjected her to a "materially adverse" action. An action is materially adverse if it "could well dissuade a reasonable worker from making or supporting a charge of discrimination." *Burlington N. and Santa Fe Ry. Co. v. White*, 548 U.S. 53, 57, 126 S.Ct. 2405, 165 L.Ed.2d 345 (2006). Barney's termination clearly qualifies as a materially adverse action.[16]

#### b. Protected Activity

[12]   [13]   [14]   "Protected activities" under Title VII are "action[s] taken to protest or oppose statutorily prohibited discrimination." *Cruz v. Coach Stores, Inc.*, 202 F.3d 560, 566 (2d Cir.2000) (citations omitted). "Opposition" to discrimination, which "need not rise to the level of a formal complaint in order to receive statutory protection," includes "activities such as making complaints to management, writing critical letters to customers, protesting against discrimination by industry or by society in general, and expressing support of co-workers who have filed formal charges." *Id.* (citations and internal quotation marks omitted). However, for an activity to be protected, a plaintiff must have "had a good faith, reasonable belief that [s]he was opposing an employment practice made unlawful by Title VII ...." *Kessler v. Westchester County Dep't of Social Servs.*, 461 F.3d 199, 210 (2d Cir.2006) (citation omitted).

**\*11** [15]   Con Ed concedes that Barney's oral complaint to Saladino about Bogus' affirmative action comment constitutes protected activity. Def.'s Mem. of Law in Support of Motion for Summ. J. at 18. Barney's October 15, 1997 letter to Heyden in Human Resources and her April 12, 1998 letter to Toussaint are also protected activities. Although Barney's March 20, 1998 letter to Cowie and March 25, 1998 letter to Trahan complained about discrimination less directly than the

other letters, it is assumed that those complaints also qualify as protected activities. Finally, plaintiff argues that she also engaged in protected activity when she attempted, during the summer of 1998, to mediate her dispute with Saladino through Toussaint, who worked in Con Ed's EEO office and who had been sent one of plaintiff's complaints. Given the absence of any objection by defendant on this point, it is assumed that those activities are also protected.

As all of plaintiff's protected activities were known to one or more Con Ed employees, plaintiff has satisfied the knowledge prong of her *prima facie* case. *See Gordon v. New York City Bd. of Educ.,* 232 F.3d 111, 116 (2d Cir.2000) ( "Neither this nor any other circuit has ever held that, to satisfy the knowledge requirement, anything more is necessary than general corporate knowledge that the plaintiff has engaged in a protected activity.").

### c. Causal Connection

[16]   [17]   "Proof of ... a causal connection can be established directly through evidence of retaliatory animus directed against a plaintiff, or indirectly by showing that the protected activity was followed closely by discriminatory treatment [or] through other evidence such as disparate treatment of fellow employees who engaged in similar conduct.' " *Terry,* 336 F.3d at 152 (citations and internal quotation marks omitted). Because plaintiff offers no direct evidence of retaliatory animus, she must produce circumstantial evidence of a causal connection

### i. Saladino And Donohue Were Not Similarly Situated

[18]   [19]   Plaintiff argues that the fact that neither Saladino nor Donohue were reprimanded for approving her erroneous overtime is evidence that her termination was retaliatory. "A plaintiff may raise ... an inference [of discrimination] by showing that the employer subjected h[er] to disparate treatment, that is, treated h[er] less favorably than a similarly situated employee outside h[er] protected group." *Graham v. Long Island R.R.,* 230 F.3d 34, 39 (2d Cir.2000) (citations omitted). To do so, a "plaintiff must show she was 'similarly situated in all material respects' to the individuals with whom she seeks to compare herself." *Id.* (quoting *Shumway v. United Parcel Serv.,* 118 F.3d 60, 64 (2d Cir.1997)). "What constitutes 'all material respects' ... varies somewhat from case to case and ... must be judged based on (1) whether the plaintiff and those [s]he maintains were similarly situated were subject to the same workplace standards and (2) whether

the conduct for which the employer imposed discipline was of comparable seriousness." *Id.* at 40 (citation omitted).

*12   [20]   Neither Saladino nor Donohue engaged in conduct that was comparable to Barney's actions. While Saladino may have failed to properly review Barney's MPARE entries, such an oversight is not similar to intentionally entering false overtime data into the MPARE system. Moreover, unlike Barney, Saladino did not stand to personally benefit from the incorrect overtime entries. Furthermore, Barney's inconsistent and implausible explanations, as well as the records showing that she deleted the March overtime data, gave Auditing additional reasons to suspect that Barney's conduct was intentional. By contrast, there is no evidence that Saladino sought to hide his failure to properly review the overtime entries from either Auditing or Donohue. Finally, although Donohue was also involved in approving Barney's overtime, there is no evidence explaining what steps he had to take to approve overtime and nothing suggesting that his method for approving overtime was, in any way, improper.

### ii. Temporal Proximity

The Second Circuit has "not drawn a bright line to define the outer limits beyond which a temporal relationship is too attenuated to establish a [causal connection]." *Espinal v. Goord,* 558 F.3d 119, 129 (2d Cir.2009) (quoting *Gorman– Bakos v. Cornell Co-op Extension of Schenectady County,* 252 F.3d 545, 554 (2d Cir.2001)). Rather, the Second Circuit has stressed that courts should focus on the "the permissible inferences that can be drawn from temporal proximity in the context of particular cases." *Espinal,* 558 F.3d at 129–30 (holding, in First Amendment retaliation case, that six months between dismissal of lawsuit brought by inmate and assault by corrections officers was sufficient to establish a causal connection because "[i]t is plausible that the officers [, one of whom was a defendant in the prior lawsuit,] waited to exact their retaliation at an opportune time-as when [plaintiff] was involved in a fight with another inmate-in order to have a ready explanation for any injuries suffered by [plaintiff]"). [17] That said, "district courts within the Second Circuit have consistently held that the passage of two to three months between the protected activity and the adverse employment action does not allow for an inference of causation." *Murray v. Visiting Nurse Servs. of N.Y.,* 528 F.Supp.2d 257, 275 (S.D.N.Y.2007) (collecting cases); *see also Clark County Sch. Dist. v. Breeden,* 532 U.S. 268, 273–74, 121 S.Ct. 1508, 149 L.Ed.2d 509 (2001) (holding that twenty-month

period "suggests, by itself, no causality at all" and citing non-Second Circuit decisions, which found three and four months periods insufficient, for the proposition that "[t]he cases that accept mere temporal proximity ... as sufficient evidence of causality to establish a prima facie case uniformly hold that the temporal proximity must be 'very close' ").

[21]   Defendant argues that the five months between Barney's April 1998 complaint to Toussaint and her termination in September 1998 are insufficient to establish a causal connection. Defendant, however, ignores the fact that Saladino requested an investigation of Barney in July. Moreover, one of Barney's theories is that Saladino and Donohue intentionally approved her erroneous MPARE entries in order to set her up for termination. Those entries were approved sometime between the beginning of March and the end of June. Given the close temporal proximity of those events and Barney's protected activities, Barney has offered sufficient evidence to meet the minimal burden necessary to establish a *prima facie* case. *See Goldman v. Admin. for Children's Servs.*, No. 04–CV–7890, 2007 WL 1552397, at *12 (S.D.N.Y. May 29, 2007) (finding that although seven months passed between protected activity and demotion, plaintiff was still able to establish a *prima facie* case where "various incidents during [that time span] were part of a course of conduct leading to her demotion, and some of those incidents occurred closer in time to her complaint.").

### iii. Decision–Maker's Knowledge Of Protected Activity

**\*13  [22]**   Defendant also argues that plaintiff cannot show a causal connection because Donohue and Cowie were not aware of Barney's complaints of racial discrimination. Although corporate knowledge of a plaintiff's complaint is sufficient to satisfy the "knowledge" prong of a plaintiff's *prima facie* case, evidence that the specific decision-makers responsible for the adverse action were not aware of a plaintiff's protected activity is still relevant "as some evidence of a lack of a causal connection, countering plaintiff's circumstantial evidence of proximity or disparate treatment." *Gordon*, 232 F.3d at 117. However, even if the decision-makers deny direct knowledge of a plaintiff's protected activity, a plaintiff can still establish a *prima facie* case where there is circumstantial evidence that the decision-makers were aware of the protected activity. *Id.*

[23]   Although Donohue and Cowie testified, at their depositions, that they did not know about Barney's complaints of race discrimination, Donohue Dep. 19; Cowie Dep. 7, both were aware of the sex discrimination complaint that Barney

raised in her March 20, 1998 letter to Cowie, a letter on which Donohue was copied. Moreover, there is circumstantial evidence that Donohue was aware of Barney's complaints about Bogus and Saladino; Bogus was Donohue's secretary and the audit report, which Donohue relied upon, stated that Barney had filed an EEO grievance against Saladino after she received a poor performance review, Ex. R (Sep. 9, 2008 Memorandum from Joseph P. Liotta).

In addition, it is not disputed that Saladino was aware of: (1) the March 20, 1998 letter, on which he was also copied; (2) Barney's complaints against him and her subsequent attempts to meditate those complaints with the help of Toussaint; and (3) Barney's complaints about Bogus, one of which was made directly to Saladino. Although Saladino played no role in the decision to terminate Barney, he did approve her overtime and asked Auditing to investigate her.

### (3)

### Defendant's Legitimate, Non–Retaliatory Reasons

Con Ed has come forward with the following legitimate non-retaliatory reasons for Barney's termination: (1) falsification of company records; (2) receipt of overtime payments to which she was not entitled; (3) failure to cooperate fully with the investigation by making misleading statements; and (4) failure to follow company procedure regarding reporting of sick days. Ex. U (Exit Interview Summary). Thus, Con Ed has satisfied its burden.

Plaintiff argues that the audit report is not admissible because "it is not a sworn document put forth based upon the personal knowledge of an affiant...." Pl.'s 56.1 Counterstatement ¶ 1. Even if the report were inadmissible, defendant would still have met its burden through the deposition testimony of Donohue and Cowie, the declaration of Frankel and the documentary evidence listing the reasons for Barney's termination, Exs. S, U. In any event, the report is clearly admissible given Donohue's reliance on the report in deciding to terminate Barney.

**\*14  [24]**   To the extent that plaintiff is arguing that the audit report is inadmissible hearsay, that argument must be rejected. Where a decision-maker claims to have relied on such a report, it is admissible to show that the decision-maker "legitimately believed [that plaintiff] had acted improperly." *Vahos v. Gen. Motors Corn.*, No. 06–cv–6783, 2008 WL

Barney v. Consolidated Edison Co. of New York, Not Reported in F.Supp.2d (2009)

2009 WL 6551494

2439643, at *4 (E.D.N.Y. June 16, 2008) (holding that investigative report was admissible for the "non-hearsay" purpose of proving that the decision-makers who discharged plaintiff believed that he acted improperly); *see also Wolff v. Brown,* 128 F.3d 682, 685 (8th Cir.1997) ("In employment discrimination cases, internal documents relied upon by the employer in making an employment decision are not hearsay as that term is defined in Fed.R.Evid. 801(c).... Rather, such documents are relevant and admissible because they help explain (or may help explain) the employer's conduct.") (citations omitted).

**[25]**  Auditing's report is also admissible as a business record under Fed.R.Evid. 803(6) because the report memorializes a routine investigation of possible employee misconduct in order to determine whether any disciplinary action needed to be taken. A declaration submitted by Mary Ciccia, the primary auditor who conducted the investigation, explains that the report was prepared pursuant to Auditing's regular business practice of investigating potential violations of Con Ed policy and drafting reports of the facts gathered through witness interviews and reviews of documents. *See* Declaration of Mary Ciccia ¶¶ 4, 10. There is no evidence that the report was prepared primarily for litigation. *Cf. Hynes v. Coughlin,* 79 F.3d 285, 294–95 (2d Cir.1996) (stating that "use of force" report prepared by corrections officer may have been admissible as a business record, but noting that such records would not be admissible as business records if they were kept primarily for the purpose of litigation); *Vahos,* 2008 WL 2439643, at *4 n. 3 (citing Christopher B. Mueller & Laird C. Kirkpatrick, Federal Evidence § 8.80 (3d ed.2007) for the proposition that "investigatory reports are 'usually prepared with an awareness that disputes or litigation may come into the picture ... and many people who provide information to company investigators are doing anything but acting in ordinary course.' ").

### (4)

### Pretext

#### a. Overtime Data And Payments

**[26]**   **[27]**  The question of whether Barney did, in fact, intentionally enter false overtime into the MPARE system is, in and of itself, not at issue in this case. *McPherson v. New York City Dept. of Educ.,* 457 F.3d 211, 216 (2d Cir.2006) ("In a discrimination case ... we are decidedly not interested in the truth of the allegations against plaintiff. We

are interested in what 'motivated the employer,' ... the factual validity of the underlying imputation against the employee is not at issue." (internal citation omitted)); *Ozemebhoya v. Edison Parking Corp.,* No. 02–CV–10057, 2007 WL 2593008, at *7 (S.D.N.Y. Sep. 7, 2007) ("An employer may sustain its employment decision without showing that the information on which it relied in its investigation was correct, but only that it reasonably relied on such information."). "Where a plaintiff has been terminated for misconduct, the question is not whether the employer reached a correct conclusion in attributing fault [to the plaintiff] ..., but whether the employer made a good-faith business determination." *Kolesnikow v. Hudson Valley Hosp. Ctr.,* 622 F.Supp.2d 98, 111 (S.D.N.Y.2009) (citations and internal quotation marks omitted). "Therefore, in the absence of evidence undermining [the employer's] assertion that it believed in good faith that [plaintiff's] conduct merited discipline and termination, or of any other evidence of pretext or discriminatory intent, [the employer] is entitled to summary judgment." *Id.* (citations omitted).

**\*15**  **[28]**   Thus, the mere fact that Barney has consistently maintained that she did not intentionally input overtime hours into the MPARE system, Barney Aff. ¶ 7, is insufficient to show pretext. While Barney advances a number of other arguments in an attempt to show pretext, she faces an uphill battle given that Donohue relied on Auditing's independent investigation in deciding to terminate her. *See Ascione v. Pfizer, Inc.,* 312 F.Supp.2d 572, 579 (S.D.N.Y.2004) (granting summary judgment on Title VII and ADEA discrimination claims where employer reasonably believed that plaintiff overstated her time records and noting that investigation was conducted by security department and not by any of the employees who allegedly discriminated against plaintiff), *aff'd,* 138 Fed.Appx. 347 (2d Cir.2005).

**[29]**   As an initial matter, plaintiff has not offered any evidence suggesting that Auditing's investigation of her deviated from normal procedures or that she was treated different from other similarly situated employees who had also been investigated by Auditing. *See Vahos,* 2008 WL 2439643, at *6 (granting summary judgment where, *inter alia,* there was no evidence that investigation was contrary to normal procedures or that plaintiff was treated differently than other employees). Furthermore, there is no evidence that Saladino, Donohue or Cowie improperly interfered with the investigation or pressured Auditing to make findings adverse to Barney. *See Graham,* 230 F.3d at 44 (explaining that, even if a jury could find that drug test was either "either

improperly administered or inaccurate," a reasonable jury could only conclude that it was reasonable for employer to rely on drug test given the absence of any evidence that employer interfered with drug testing process in order to discriminate against plaintiff); *Ozemebhoya,* 2007 WL 2593008, at *7 (granting summary judgment where plaintiff failed to show that employer acted unreasonably in relying on results of investigation and noting that there was no evidence in the record that any of defendant's employees improperly interfered with the investigation) *with Terry,* 336 F.3d at 146 (vacating grant of summary judgment where plaintiff offered evidence that social worker was pressured to compromise his professional integrity and declare plaintiff a threat to other employees).

Plaintiff, however, contends that the investigation was tainted because Auditing relied on evidence generated by Saladino and Donohue. Plaintiff claims that Saladino and Donohue were "responsible for," Pl.'s Opp'n Brief at 21, the overtime payments being deposited into Barney's account because she would not have received the payments if they had not approved the overtime entries. In essence, Barney's theory is that Saladino and Donohue sought to set her up for termination by intentionally approving her erroneous overtime entries so that the overtime payments would be deposited into Barney's bank account.

**\*16** In support of this argument, plaintiff cites to *Quinn v. Green Tree Credit Corp.,* 159 F.3d 759, 770 (2d Cir.1998), which held that summary judgment was improper where there was "a strong temporal correlation" between plaintiff's protected activity and her termination and "nearly all of the record evidence supporting the Company's asserted non-retaliatory reason for discharge" was generated by the alleged harassers after plaintiff contacted a state administrative agency. However, as explained below, *Quinn* is factually distinguishable.

There is no evidence to suggest that Saladino and Donohue approved the overtime entries knowing that the entries were incorrect. Saladino testified at his deposition that, in approving overtime, he would use a group approval code and, therefore, would not review the overtime hours for individual employees. Barney offers no evidence to undermine Saladino's explanation. The mere fact that Saladino could have viewed individual names in approving overtime is, standing alone, insufficient as no reasonable juror could discredit Saladino's explanation based on that evidence. Although Donohue was also involved in approving

Barney's overtime, there is no evidence explaining his role in this process and nothing in the record to suggest that he intentionally approved her overtime entries knowing that the entries were erroneous.

In addition, Barney's theory that Saladino and Donohue intentionally approved her erroneous entries makes little sense given that the deposit of the overtime payments into Barney's account did nothing to establish that Barney's incorrect entries were intentional. Barney's theory rests on the flawed assumptions that: (1) her mere receipt of the overtime payments was the only reason for her termination; and (2) if Saladino and Donohue had discovered her erroneous entries during the approval process, Con Ed would have had no reason to terminate her. However, even if Saladino and Donohue had not approved the erroneous entries and the overtime payments were never direct deposited into Barney's account, Con Ed would still have had grounds to terminate Barney if Auditing concluded that she intentionally entered false overtime data. *See* Cowie Dep. 9 (explaining that employees who falsified records have been terminated even if no theft was involved).

Furthermore, Auditing's conclusion that Barney intentionally falsified her records and engaged in other intentional misconduct rested, almost exclusively, on computer records and interviews with Barney and Mason—not on evidence "generated" by Saladino. Auditing's determination was based on: (1) records showing that Barney's explanation regarding Cortes' overtime was implausible; (2) records showing that Barney deleted her March overtime data in July; and (3) Barney's original explanation to Mason about the $73 payment, which conflicted with Barney's later statements.[18] All of these incidents occurred after the approval of Barney's overtime and there is no evidence that Saladino played a role in any of these incidents. In fact, the only evidence from Saladino that Auditing relied on (other than his explanation for approving her overtime entries, which, as explained earlier, has not been discredited and does not even evidence Barney's guilt) appears to be Saladino's statement to Auditing that, although Barney had made MPARE errors regarding a sick day and some attendance records, he was not aware of any errors she made regarding overtime. Barney, however, does not even contend that this statement was false.

**\*17** **[30]** Finally, plaintiff has offered no evidence that would allow a reasonable juror to conclude that the critical decisions made in her termination, namely Saladino's decision to involve Auditing and Auditing's conclusion that

Barney v. Consolidated Edison Co. of New York, Not Reported in F.Supp.2d (2009)

2009 WL 6551494

Barney committed intentional misconduct, were anything other than genuine good-faith business decisions. As the Second Circuit has explained, although evidence showing that an employer made an erroneous or poor business decision is insufficient "to establish a genuine issue of fact as to the credibility of the employer's reasons," there is a distinction between a poor business decision and a reason manufactured to avoid liability. *Dister v. Cont'l Group, Inc.,* 859 F.2d 1108, 1116 (2d Cir.1988) (citation omitted). "[F]acts may exist from which a reasonable jury could conclude that the employer's 'business decision' was so lacking in merit as to call into question its genuineness." *Id.* (citations omitted); *see also DeMarco v. Holy Cross High Sch.,* 4 F.3d 166, 171 (2d Cir.1993) ("[I]n an ADEA or Title VII case, a plaintiff may be able to put into question the genuineness of the employer's putative non-discriminatory purpose by arguing that the stated purpose is implausible, absurd or unwise.").

Nothing in the record could convince a reasonable juror that the critical decisions at issue were anything but good-faith business decisions. First, given that Barney, who was responsible for entering overtime, received two overtime payments that she admitted she was not entitled to, there is no basis to question Saladino's decision to have Auditing investigate the matter. Second, contrary to plaintiff's claim that the decision to terminate her was "outrageous," Pl.'s Opp'n Brief at 22, Auditing's determination that her actions were intentional was reasonable (as were the decisions by Donohue and Human Resources to accept Auditing's conclusions). At first blush, the fact that Barney originally asked Mason about the $73 check would seem to suggest that Barney's entry of the March overtime data was not intentional.[19] However, no reasonable juror could find Auditing's conclusions to be so lacking in merit as to call into question their genuineness in light of: (1) Barney's implausible explanation regarding Cortes' overtime; (2) her deletion of the March overtime data in July; (3) her conflicting explanations about the $73 payment; and (4) the fact that she did not enter incorrect overtime for any employee other than herself.[20] Although it is somewhat difficult to square Barney's initial reporting of the $73 payment to Mason with the notion that her March overtime entries were intentional, given her subsequent attempts to conceal her overtime entries and retain the overtime payments, it was certainly reasonable for the auditors (who Barney has never even argued had a retaliatory motive) to resolve this ambiguity against Barney and infer that she had intentionally entered false data. *See Duviella v. JetBlue Airways Corp.,* No. 04–CV–5063, 2008 WL 1995449, at *5 (E.D.N.Y.

May 6, 2008) (granting summary judgment and noting that: (1) in crediting alleged victim in sexual harassment investigation rather than plaintiff, human resources manager made "reasonable credibility determination" even though victim's story could not be corroborated; and (2) manager's failure to investigate plaintiff's theory was reasonable in light of the "fanciful nature" of that theory). Moreover, even if Barney's overtime entries may have been unintentional, it was certainly reasonable for Auditing to conclude that Barney's attempts to conceal her earlier actions were intentional and improper.[21]

**b. Jury Duty Service**

*\*18* Barney takes issue with the report's findings about her failure to report her sick days during the end of her grand jury service. Barney contends that her actions were not improper because court employees told her that if she recovered from her illness she had to go back to jury duty and could not report to work. This fact, however, does not show that Barney's failure to report the sick days was not a violation of Con Ed policy. Moreover, Barney does not dispute the report's assertion that when asked about these sick days, she told Auditing that she did not inform Con Ed that "she was sick because it made no difference to [Con Ed] since she was not at work in either case." Ex. R (Sep. 9, 2008 Memorandum from Joseph P. Liotta).

**c. Middleton's Allegations Of Retaliation**

[31]  [32]  In attempting to show that Cowie retaliated against her, Barney points to the deposition testimony of Leonard Middleton, another Con Ed employee. Middleton was also an executive board member of the African American Utilities Workers Association ("Association"), of which Barney was the secretary. Middleton claims that Cowie, who was Middleton's second-level supervisor, retaliated against him.[22] Middleton Dep. 54, 167.

Middleton made numerous complaints during his tenure at Con Ed, beginning with letters he wrote, on behalf of the Association, to two Con Ed chairmen in the early 1980s regarding the plight of minority employees and problems with Con Ed's EEO office. Middleton Dep. 54, 168. At his deposition, Middleton stated that Con Ed has a "corporate culture of retaliation," Middleton Dep. 167, and discussed a number of particular incidents.

In an attempt to draw a parallel between her case and Middleton's claims, Barney points to Middleton's testimony that, on an unidentified date, he put in a petty cash voucher for $13 and received a check for $13,000. Middleton Dep. 88. Because other board members of the Association had been "attacked and harassed by management," Middleton thought the $13,000 check might be a setup. Middleton Dep. 89. Although plaintiff submitted deposition testimony showing that Middleton eventually confronted "the director," Tom Cronin, about the payment, plaintiff did not include Middleton's entire deposition answer about this incident, leaving Cronin's response and the eventual outcome of the incident to speculation. *Id.* 89.

Plaintiff appears to argue that Middleton's receipt of the $13,000 petty cash check indicates that Con Ed supervisors, and presumably Cowie in particular, have a practice of using such schemes to set up employees who engage in protected activity. That argument is meritless. As explained previously, it was Barney's own actions, and not the mere deposit of the overtime payments into her account that resulted in her termination. Moreover, although the concurrence of Cowie, as Vice President of Human Resources, was required before Donohue could terminate Barney, there is no evidence that Cowie was, in any way, responsible for the approval of Barney's overtime or Middleton's receipt of the $13,000 check. In addition, there is no evidence that Middleton was ever disciplined for the $13,000 check and no evidence, other than Middleton's speculation, that the check was anything other than an unintentional error.

**\*19 [33]** Middleton's other allegations of retaliation add little to Barney's retaliation claim. Although plaintiff notes that she and Middleton were both board members of the Association, plaintiff has never contended that she was retaliated against for her role with the Association and has never even argued that her membership constituted protected activity.[23] More importantly, Middleton's allegations of retaliation lack probative value as his allegations do not even show a *prima facie* case of retaliation. Where a plaintiff contends that other employees were discriminated against, courts have placed little weight on such arguments where the evidence fails to suggest that the other employees were, in fact, discriminated against. *See McCarthy v. New York City Technical College of City Univ. of New York,* 202 F.3d 161, 165 (2d Cir.2000) (explaining that plaintiff's attempt to rely on allegedly discriminatory termination of co-worker was "substantially undercut by the fact that the defendant's proffered reason for terminating the co-worker

was supported by the record"); *Henkin v. Forest Labs., Inc.,* 01–cv–4255, 2003 WL 749236, at \*7–8 (S.D.N.Y. Mar. 5, 2003) (explaining that "where [the] record makes clear that plaintiff was not reaching adequate levels of performance and was not following procedures correctly," the fact that co-worker in same protected class was also fired did not support inference of discrimination because "defendant provide[d] a legitimate non-discriminatory reason for [the co-worker's] termination"), *aff'd,* 88 Fed.Appx. 478 (2d Cir.2004).

Middleton's conclusory allegations of retaliation, which are explained below, fail to establish even a *prima facie* case, particularly with regard to the causal connection requirement. Because Middleton has offered no statements or other evidence directly exhibiting retaliatory animus, there must be some circumstantial evidence, such as temporal proximity, to establish a viable retaliation claim.

First, after Middleton gave a speech on June 13, 1998 (the content and subject-matter of which are not mentioned in the record), two individuals named "Mr. Shapiro" and "Mr. John Stack" allegedly retaliated against Middleton, at an undisclosed time, by falsifying his reviews and harassing him. Middleton Dep. 28–29. Given the lack of any evidence about the content of his June 13, 1998 speech, it is unclear that the speech even qualifies as protected activity. In any event, because there is no evidence regarding the amount of time between the speech and the harassment and false reviews, it cannot be said that a causal connection exists in this instance based on temporal proximity. Moreover, although Middleton claims that Cowie retaliated against him, Middleton did not specifically allege that Cowie played any role in the false reviews or harassment. Middleton Dep. 28–29.

Second, as part of the race discrimination class action against Con Ed in which Middleton was a plaintiff, Middleton met, in August or September 1999, with Con Ed employees and counsel, including Cowie. Middleton Dep. 165–66. At the meeting, Cowie told the eight plaintiffs present that they would not be retaliated against. Middleton Dep. 166. Despite this, Middleton alleges that he was retaliated against in August 2000 when his job responsibilities were taken away from him and he was left with "nothing to do for eleven months." Middleton Dep. 166. There is no evidence of any causal connection between that action and Middleton's protected activity as his meeting with Cowie in August or September 1999 occurred almost a year before his job responsibilities were taken away from him and there is no evidence of any other protected

activity during the intervening year, *see Treglia v. Town of Manlius,* 313 F.3d 713, 720–721 (2d Cir.2002) (holding that although adverse action occurred a year after filing of administrative charge, causal connection was established where plaintiff told employees that they may be contacted as part of administrative investigation one month before adverse action); *Peres v. Oceanside Union Free Sch. Dist.,* No. 05–CV–1807, 2008 WL 305342, at *14 (E.D.N.Y. Jan. 31, 2008) (finding that "the passage of over one year between the time of Plaintiff's last complaint and [the adverse employment action] is too long to raise a question of fact on causation."). Also, Middleton's vague statement that "everyone else was phased out of the department," Middleton Dep. 166, is insufficient to show that he was treated different from similarly situated employees. In addition, Middleton does not allege any specific involvement by Cowie in this action, only vaguely stating that Cowie likely had "knowledge of what I did," Middleton Dep. 168.

*20 Third, in late 2000 or early 2001, Middleton complained to Cowie about another employee being retaliated against. Middleton Dep. 22. Middleton, however, did not allege that he was retaliated against, in any manner, for this complaint.

**d. Other Potential Evidence Of Pretext**
One other piece of evidence merits brief discussion. While Donohue testified that the audit report was the sole reason for Barney's termination, Cowie testified that Donohue told him that he believed Barney's termination was warranted based on the audit report and her overall performance. Notably, Barney has never raised this argument.

**[34]** "[A] jury issue on the question of pretext may be created when an employer offers inconsistent and varying explanations for its decision to terminate a plaintiff." *Roge v. NYP Holdings, Inc.,* 257 F.3d 164, 170 (2d Cir.2001); *see also Carlton v. Mystic Transp., Inc.,* 202 F.3d 129, 137 (2d Cir.2000) (finding issue of fact where employer "expressly stated" to the EEOC that job performance was not a factor in plaintiff's termination and then later asserted that plaintiff was "terminated in part because of poor performance."); *E.E.O.C. v. Ethan Allen, Inc.,* 44 F.3d 116, 120 (2d Cir.1994) (vacating grant of Rule 50 motion where defendant abandoned its initial justification given to state investigators, which defendant had earlier termed the "sole reason" for plaintiff's discharge). No reasonable juror, however, could conclude, based on the discrepancy between the statements of Donohue and Cowie, that Donohue's and Human Resources' purported reliance on the audit report was a pretext for retaliation. Donohue testified

that he relied on the audit report and all of the reasons given to Barney at the termination meeting stemmed from the report. Although a reasonable juror could conclude that Donohue may have also considered Barney's poor work performance, that does not show that Con Ed's reasons were false or that retaliation was a substantial reason for Barney's termination. *See Reeves,* 530 U.S. at 148, 120 S.Ct. 2097 (judgment as a matter of law may be appropriate when "a weak issue of fact as to whether the employer's reason was untrue and there was abundant and uncontroverted independent evidence that no discrimination had occurred."); *see also Hodges v. Rensselaer Hartford Graduate Ctr., Inc.,* 06–CV–850, 2008 WL 793594, at *11 (D.Conn. Mar. 20, 2008) (citing to *Reeves* and granting summary judgment even though decision-maker's "slightly shifting justifications for his decision ... may be marginally suspect").

(5)

**Mixed Motives**

**[35]   [36]** In her brief, plaintiff makes passing reference to the mixed-motive framework of *Price Waterhouse v. Hopkins,* 490 U.S. 228, 258, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989) (plurality opinion). Pl.'s Opp'n Brief at 22 ("Evidence of retaliatory animus also may suffice to defeat a summary judgment motion notwithstanding the impropriety of the plaintiff's misconduct"). "[T]o warrant a mixed-motive burden shift, the plaintiff must be able to produce a 'smoking gun' or at least a 'thick cloud of smoke' to support h[er] allegations of discriminatory treatment." *Raskin v. Wyatt Co.,* 125 F.3d 55, 60–61 (2d Cir.1997). A plaintiff can meet this burden by offering, for example, evidence of "statements or actions by decisionmakers that may be viewed as directly reflecting the alleged discriminatory attitude." *Id.* Because Barney did not produce any such evidence, it was appropriate to analyze her claims under the *McDonnell Douglas* pretext framework. *See Gant ex rel. Gant v. Wallingford Bd. of Educ.,* 195 F.3d 134, 146 (2d Cir.1999) (explaining that where the plaintiff "fails to produce any such evidence, the plaintiff cannot withstand a motion for summary judgment by arguing that a jury might reasonably find in his favor under the mixed-motives framework."); *Beauchat v. Mineta,* 257 Fed.Appx. 463, 465 (2d Cir.2007) (rejecting plaintiff's argument that district court should have used mixed-motive analysis rather than *McDonnell Douglas* pretext analysis because there was no evidence "directly reflecting the alleged discriminatory attitude.").

**Barney v. Consolidated Edison Co. of New York, Not Reported in F.Supp.2d (2009)**

2009 WL 6551494

(6)

**Section 1981 Claim**

*21 [37] Although plaintiff's brief refers to a Section 1981 retaliation claim, Pl.'s Opp'n Brief at 9, plaintiff's judicial complaint did not allege any violation of Section 1981. In any event, "[t]he elements required to make out a claim of retaliatory discharge under 42 U.S.C. § 1981 are the same as those required to make out such a claim under Title VII." *Taitt v. Chem. Bank,* 849 F.2d 775, 777 (2d Cir.1988). Because summary judgment is being granted on plaintiff's Title VII claim, summary judgment is also warranted on her Section 1981 claim.

(7)

**State Law and Municipal Law Claims**

[38] If a district court dismisses all claims over which it has original jurisdiction, it may, in its discretion, decline to exercise supplemental jurisdiction over state law claims.

28 U.S.C. § 1367(c)(3); *Tops Mkts., Inc. v. Quality Mkts., Inc.,* 142 F.3d 90, 102–03 (2d Cir.1998). Plaintiff's retaliation claims under the New York State Human Rights Law and the New York City Administrative Code arise under state and municipal law. Consequently, because plaintiff's Title VII and Section 1981 claims do not survive summary judgment, plaintiff's state and municipal law claims are dismissed without prejudice. *See Murray,* 528 F.Supp.2d at 280–81 (granting summary judgment on Title VII claims and dismissing state and city law claims without prejudice).

**Conclusion**

Defendant's motion for summary judgment is granted with regard to plaintiff's federal retaliation claims and the federal and state law claims that she abandoned. Plaintiff's retaliation claims under the New York State Human Rights Law and the New York City Administrative Code are dismissed without prejudice.

SO ORDERED.

**All Citations**

Not Reported in F.Supp.2d, 2009 WL 6551494

Footnotes

1    Plaintiff's complaint also alleged race discrimination, age discrimination, discrimination under ERISA based on interference with her pension benefits and intentional infliction of emotional distress. Defendant moved for summary judgement on all claims. In plaintiff's opposition papers, she explicitly abandoned all claims other than her retaliation claim. Pl.'s Brief in Opp'n to Summ. J. ("Pl.'s Opp'n Brief") at 4.

2    All letter-designated exhibits refer to the exhibits attached to the Carey Declaration.
     Exhibit A is the charge that Barney filed with the EEOC. Included in Exhibit A are a number of documents that she attached to her charge. Citations to specific page numbers in Exhibit A refer to the sequential order of the pages and not to the page numbers that are printed on the documents.

3    Starting in 1992, Barney served as the secretary of the African American Utilities Workers Association ("Association"), an organization of union and management employees that has a history of working with Con Ed to improve its equal employment opportunity policies. Deposition of Leonard Middleton ("Middelton Dep.") 54; Ex. A at 3 (EEOC Charge). Plaintiff's counsel asserts that the Association was the principal sponsor of the class action against Con Ed and that "members of [the Association] were included in a Daily News photograph and article discussing [the] ... class action lawsuit that they were part of...." Pl.'s Opp'n Brief at 8; Pl.'s July 12, 2009 Notice of Motion at 5–6. There is no evidence in the record directly supporting counsel's assertions regarding the Association's involvement. (Barney may have addressed this issue at pages 19–20 of her deposition; however, her answer on page 20 is incomplete and page 19 is not part of the record). The closest evidence on point is the deposition testimony of Leonard Middleton, a member of the Association's executive board, who testified that he was a plaintiff in the class action suit. Middelton Dep. 53–54, 166.

4    Barney's five prior reviews had all occurred in December. However, the timing of Barney's March 1998 review was dictated by a company-wide change in Con Ed's review policy. Ex. J (Declaration of John De La Bastide).

5    In the four reviews prior to Barney becoming Saladino's secretary, although she received satisfactory reviews, Ex. H (1992, 1993, 1994 and 1995 reviews), those reviews did note problems with Barney's communication skills, including

Barney v. Consolidated Edison Co. of New York, Not Reported in F.Supp.2d (2009)
2009 WL 6551494

criticism that Barney's oral and written communications were periodically confusing. *Id.* Some of these reviews also noted issues with Barney's performance. *See* Ex. H (1993 review) (stating that "Barney meets expected level of performance but occasionally repeats mistakes"); Ex. H (1994 review) (stating that "for the most part" Barney performed routine secretarial duties in an accurate and timely manner and that Barney "[b]asically meets expected level of performance results required.").

> In 1986, Barney received a negative review, which resulted in her being placed on a 90–day performance plan. Ex. H (1986 review). The 1986 review noted that Barney was unwilling to accept criticism and responsibility when confronted with errors and that Barney's performance of basic secretarial skills was not satisfactory. *Id.*

6       Barney admitted that Saladino had cautioned her, in August 1996, about typing errors. Barney Dep. 231; Ex. L (deposition Ex. Z) (Aug. 1996 letters with typos). Barney also admitted to other errors. Barney Dep. 42, 228, 231, 233; Ex. L (deposition Ex. W) (Oct. 10, 1996 e-mail from Ron James to Barney pointing out two errors and noting that "More care is needed."); Ex. L (deposition Ex. BB) (Oct. 17, 1997 e-mail from Keith Barouch to Barney asking her to correct incorrect telephone number); Ex. L (deposition Ex. Y) (Feb. 23, 1998 e-mail from Richard Monahan to Barney telling her that she requested an item that he had already sent her); *see also* Ex. L (deposition Ex. X) (Sep. 13, 1996 chain of e-mails noting error by Barney that was pointed out by an employee named "Nagri"); Barney Dep. 228–30 (conceding she "probably" committed error in September 1996); Barney Dep. 234 (admitting she sent out Dec. 17, 1997 e-mail for meeting with conflicting dates, but insisting that, before Saladino pointed out error, she sent corrected e-mail, which, notably, is not part of the record); Ex. L (deposition Ex. CC) (Dec. 17, 1997 e-mail from Saladino to Barney).

7       Contrary to plaintiff's argument, Exhibit R, which consists of a report prepared by Con Ed's Auditing Department and documentary information that was attached thereto, is admissible. *See infra* at —— – ——.

8       The record does not include a copy of the pay statement for the $73 payment. However, it appears that the statement would have informed Barney that the payment was for "compensatory" earnings. A June 30, 1998 pay statement that Barney received for additional hours of overtime stated that the payment was for "compensatory" earnings. Ex. R (Statement of Earning and Deductions for Barney dated June 30, 1998).

9       Although Mason refers to this as a "check," since Barney had direct deposit at the time, she would have received a pay statement rather than a check to deposit. Ex. R (Statement of Earning and Deductions for Barney dated June 30, 1998). There is, however, no evidence indicating that Barney's pay statement, which was likely in a sealed envelope when it was given to Mason, would have, from the outside, appeared any different than the pay statements for employees who did not have direct deposit.

10      Although Mason testified, at his deposition, that if Saladino had been the supervisor to review the entries, he should have seen that Barney was receiving two payments that she was not entitled to, Mason Dep. 38–39, there is no evidence that Mason knew that it was Saladino's practice to use a "group approval code" to approve the overtime.

11      At her deposition, Barney testified that Con Ed did not pay her while she was on jury duty and that, instead, she received $14 a day from the court for her jury service. Barney Dep. 238.

12      At her deposition, Barney explained that she did not report the sick days because it was her understanding that when she was on grand jury duty she was "accountable to the court," not to Con Ed. *Id.* at 237. Barney was told by court personnel that if she were to call in sick for grand jury service she had to stay home on that day and could not go to work. Barney Aff. ¶ 10.

13      Vincent Frankel, Department Manager of the Employee and Labor Relations Department, submitted a declaration asserting that the audit report's findings were the only reason for Barney's termination. Ex. DD (Declaration of Vincent Frankel) ¶ 10.

14      Peterson was present during Bogus' racial comments to Barney and was interviewed during the EEO office's investigation of those comments. Barney Dep. 98–99, 329–30; Ex. K (Attachment # 3 to EEOC charge).

15      In *Gross v. FBL Fin. Servs., Inc.,* 557 U.S. 167, 129 S.Ct. 2343, 174 L.Ed.2d 119 (2009), the Supreme Court held that the mixed-motive framework established in *Price Waterhouse v. Hopkins,* 490 U.S. 228, 258, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989) (plurality opinion), is inapplicable to ADEA claims and that ADEA plaintiffs must prove that age was a "but-for" cause of any adverse actions taken against them. As such, it is unclear if "motivating factor" causation and the *Price Waterhouse* framework are still applicable to retaliation claims under Title VII and Section 1981. However, because the Second Circuit has yet to overturn its prior retaliation decisions, *see Tori v. Marist College,* 344 Fed.Appx. 697 (2d Cir.2009) (citing Jute for the proposition that "the employee must show that retaliation was a substantial reason for the adverse employment action," but not discussing *Gross* ), it is assumed that those cases are still binding precedent, *see Hardy v. Town of Greenwich,* 629 F.Supp.2d 192, 200 (D.Conn.2009) (noting that the Second Circuit may, in light of Gross, revisit its current precedent that applies *Price Waterhouse* to § 1981 cases, but refusing to presume such a

2009 WL 6551494

change in precedent). Plaintiff's suggestion that her claim should be analyzed under the Price Waterhouse framework is addressed more fully *infra* at — – —.

16   Given Barney's assertions that her unsatisfactory 1998 review barred her from receiving a raise and from applying for promotions, Def.'s Ex. N; Barney Dep. 156, that review also appears to rise to the level of a materially adverse action, *see Mauskopf v. District 20 of New York City Dep't of Ed.,* 299 Fed.Appx. 100, 101 (2d Cir.2008) (holding that unsatisfactory performance review without any accompanying evidence of negative consequences was not a materially adverse action). Although Barney's judicial complaint alleged that her unsatisfactory review was retaliatory, on summary judgment, Barney appears to have abandoned that claim and elected to proceed solely on the theory that her termination was retaliatory. Pl.'s Opp. Br. at 9. In any event, no reasonable juror could conclude that the unsatisfactory review was retaliatory. There is undisputed evidence of mistakes made by Barney and most of the criticisms in her 1998 review had previously been raised by Saladino in her 1996 review, which occurred prior to her engaging in any protected activity, *see Slattery v. Swiss Reinsurance Am. Corp.,* 248 F.3d 87 (2d Cir.2001) (finding no causal connection where adverse employment actions were the result of "an extensive period of progressive discipline" that began five months prior to filing of EEOC charge). Moreover, given that Saladino's criticisms began prior to Barney's protected activity, the satisfactory reviews she received from prior supervisors do not suggest that the 1998 review was retaliatory. *See Blanc v. Sagem Morpho, Inc.,* No. 07–CV–3085, 2009 WL 1813236, at *17 (E.D.N.Y. June 25, 2009) (finding that plaintiff failed to show pretext where plaintiff admitted to a number of incidents of unsatisfactory performance and explaining that prior satisfactory evaluations from different supervisors did not show pretext, particularly in light of evidence that new supervisor was more demanding that prior supervisors).

17   In *Espinal,* the plaintiff claimed that the officers told him during the assault that "this is what happens to [i]nmates when they submit law suits against us." *Espinal,* 558 F.3d at 122. Although this direct evidence of retaliatory animus would appear sufficient, standing alone, to establish a causal connection, the Second Circuit did not address this fact in its discussion and appears to have relied solely on the temporal proximity between the lawsuit and the assault.

18   Barney does not contend that Mason retaliated against her and there is no evidence that Mason was even aware of her protected activities.

19   At his deposition, Donohue speculated that Barney may have forgotten what the money was for. Donohue Dep. 29.

20   The fact that plaintiff wrote a check to Con Ed for the May overtime payment "shortly after" it was deposited into her account, Pl.'s Opp'n Brief at 5, does little to suggest that the overtime entries were not intentional given that Barney only returned the money after Saladino confronted her about the payment.

21   Barney's entry of erroneous overtime data may have, in fact, been simply an unintentional mistake that Barney attempted to cover up after the mistake was discovered. However, even if that were the case, it would not show that the decision to terminate her was retaliatory. Auditing's conclusions were reasonable and, moreover, Con Ed's reasons for her termination went beyond the mere entry of incorrect overtime data and receipt of the overtime payments. Con Ed concluded that Barney made misleading statements and falsified company records, which included improperly deleting the March overtime data in July.

22   Plaintiff did not raise this argument in her opposition brief. Rather, inexcusably, plaintiff waited until nine months after briefing of the summary judgment motion was complete to submit letters raising this argument. These letters also included deposition testimony that had not previously been made part of the record. Plaintiff's delay alone is reason to reject this argument. In any event, even if plaintiff did properly raise this argument, for the reasons explained *infra* this argument fails to raise a material issue of fact on plaintiff's retaliation claim.

23   One district court has suggested that, in some circumstances, a plaintiff may bring suit claiming retaliation for membership in an organization where the plaintiff shows that the organization is engaged in protected activities and there is evidence that the relevant decision-makers knew about both those activities and the plaintiff's membership in the organization. *See Gonzalez v. City of New York,* 354 F.Supp.2d 327, 341–43 (S.D.N.Y.2005). Plaintiff has failed to offer evidence from which it could be inferred that the relevant decision-makers knew about her membership in the Association. The only evidence potentially relevant to this point is Middleton's testimony that, as the Association's secretary, Barney's name was listed in a newspaper that the Association distributed to African American employees at Con Ed and to "some" unnamed "executives." Middleton Dep. at 53–54.

**End of Document**      © 2016 Thomson Reuters. No claim to original U.S. Government Works.